or arguments not to exceed 15 minutes per side. Mr. Andrew Goetz for the appellant. May it please the court. Andrew Goetz for the United States. With the court's permission, I would like to reserve three minutes for rebuttal. This court has never held that a person is in custody under Miranda when he is advised that he is free to leave. This case should not be the first. Now the core question, the ultimate question here, is whether the defendant was formally arrested or whether his movement was restrained to the degree associated with a formal arrest. Whether what was going on here was equivalent to a formal arrest. That's the Miranda custody determination. And the most important factor, what this court has characterized as the most important factor, and what the Supreme Court called most important in house, is whether the defendant is told that he was free to leave. Here, during the interview, the defendant was told multiple times over that he was free to leave, that the interview was voluntary, that he was not under arrest, that he was not in custody. He was told from the outset, the very first statement on the recording after they sit down in the large unlocked conference room is, I appreciate you being here voluntarily. He's told that from the outset. And then after he's told that the investigation is about him, the agents repeat at minute one, I do appreciate the fact that you're willing to sit down and talk with us today. Willing, that's a statement about voluntariness. But, I mean, he was never told directly, you are free to leave the room. I don't think that's correct, Your Honor. In fact, at minute 41, he's told you're free to leave. At minute eight, though, that's pretty early on, he's told you're not in custody. I never said you're under arrest. I can't force you to talk with us. And also, you're talking to Ray and I voluntarily. So that emphasized the point made at the outset, that he could leave at any time. So what if the officers, you put a lot of weight on the fact that he was given these verbal, I don't want to call them admonishments, but he was told that he could leave or he was there voluntarily. Is there nothing that could overcome those verbal cues from the officers, from the agents? No, Your Honor. We're not asking for a categorical rule that says any time they say that, it can never be custody. You can imagine if they said that and they were pointing a gun at him, for instance. I mean, the actions would speak louder than the words here. But in a close case, this Court has said that those admonishments make all the difference. And at best for the defense, this was a close case. And more likely than that, every single other factor supported the government here. So we're just asking this Court to follow what it said in Panic, what it said in other cases, that in a close case, those admonishments make all the difference. And the record here is just replete with those. It's regular every few minutes he is told this is a voluntary interview. He does say, I just want to go home, though, right? And they basically say, you can't go home. And I understand that's different from you can't leave this room. But it sure could be. If what he wants to do when he leaves the room is go home and he's told he can't go home, that sounds like you can't. Sounds like it anyway, doesn't it? So if that were taken in isolation, Judge Rogers, that might be a point against us. But in context, it was taken and it was responded to when they were talking about what was happening at his home, that the search warrant was happening at his home. So even if they were pointing out to him that even if he left the room, he couldn't go home while they were searching his house. The interview was happening simultaneously with the search warrant. He couldn't go home? I mean, why not? Well, he could go to his home, not inside his home. I mean, search warrants frequently happen when the – If I was free to go and someone was searching my house, I'd want to go home. I mean, right? Understandably. He might stop me at the door, but I'd like to go and get stopped at the door. No question. But that's a different issue than whether he's free to terminate the interview and leave, where you'd like to go. There are lots of places he'd like to go. And this actually dovetails into the point the defense is making, that he asked several times that he wanted to work his shift. Well, again, that's a different question. He's not going to be able to work his shift that night. I mean – I understand. What about when he asked for some – he wanted to get some water? Yes, so he asked for some water. He actually didn't ask to go get the water. He just asked if he could have some water. And the agent immediately says, he'll go get it for him. And he did. There's no question he did. So there's nothing in the record indicating he wanted to leave the room to get some water? There is testimony from the defendant that he wanted to leave the room. Now, that doesn't quite square with what the recording says. But even if you interpret that fact in the light most favorable to the defendant, the fact that he would have needed an escort or couldn't go freely to get water within Detroit Police Headquarters, that doesn't point in favor of custody. These interviews frequently happen in a station house or an employment setting where there are restrictions on where the person can go in the building. That doesn't mean the person isn't free to terminate the interview and leave. So you bring up the recording, and I've listened to the recording. The district court judge made some conclusions about what was – made inferences from the recording. It says things like, you can hear the desperation in Mr. Martinez's voice. I listened to the recording. I don't really hear that. The district court judge says that the officers were confrontational. I forget exactly what the words were that the district court judge used, confrontational, something like that. I listened to it. I didn't think they were aggressive or confrontational. Nonetheless, the district court made these findings, and I'm wondering what we do with that. I'm not the district court judge. Now, the Supreme Court has said in the qualified immunity context, for example, that if there's a video recording that contradicts the evidence found by the district court, but there it is on video playing for everyone to see and the district court found something else, you don't owe any deference to those findings by the district court. Is that the case here? What do I do with the fact that Judge Tarnow and I listened to this recording differently? The answer is yes, that is the case here. Actually, this court held that in Crompton. It's a Miranda case actually from the same district judge with a recording where the government appealed, where the district judge said that the recording, the officer on the recording, contradicted his own Miranda warnings. This court listened to that recording and said, well, that's just not what happened. That's not what the recording shows. Yeah, but that would be one thing. But these are sort of inferences about tone as opposed to was this fact stated? Did someone make this statement? And the recording doesn't have that statement is different than Officer Martinez sounded desperate or the FBI agents were confrontational. Those are sort of conclusions about tone and demeanor and what do I do with that? You do two things with that, Your Honor. First is that his tone at least, that's a subjective fact. That doesn't influence the custody analysis here. His tone meaning Martinez's? Martinez's tone. That's a subjective fact. And that's actually where the district court goes off the rails legally in trying to explain away all the statements the agents made about this being a voluntary interview. So that's a legal error. His tone, what he's thinking, doesn't matter for purposes of this objective analysis. So that's what you do with that at step one. Step two I think is more of a nuanced point. When the cases talk about tone and deference, they're usually talking about situations where somebody's testifying in court and all the court of appeals has is a transcript. So that's maybe where a little bit more deference is due. Maybe there's some deference due here, but this court has that recording. It can hear that the questioning is polite. There's no desperation. It is firm, it's thorough, it's polite and cordial, and the recording really speaks for itself as in Crompton. Now, in addition to all the statements that he's here voluntarily, all the other factors here point in the government's direction as well. The length and manner of questioning, for instance, it was a cordial interview. The length, an hour and 20 minutes, is actually less time than the hour and 30-minute interview in Mahan where this court said that cut against a finding of custody. And it's far less time than in Howes where five hours wasn't enough to turn something into a custodial encounter. So the length and manner of questioning cut in the government's favor here too. The location of the questioning, this is a 30-year veteran of the Detroit Police Department who's interviewed in an unlocked conference room at Detroit Police headquarters. The district court said it was locked. How do I know that it's unlocked? The district court, I mean, it's clear that you had to enter this room with a key. The district court says the conference room was locked. I know your briefing says it isn't. What do I do with that? I think the district court never said it was locked. We're talking about two different things here. One is locked to get into the Michigan State Police Department section of the building. It's locked to get in. It requires key card access similar to a lot of government buildings, similar to a judge's chamber, similar to the U.S. Attorney's Office, similar to a lot of places they require a key card to get in. The conference room itself didn't require a key card in or out, and that's actually at page 233 and then 228 through 29 of the record where they talk about the differences here. It's locked to get into that section, not locked to get in the conference room, not locked to get out of anything. I mean, the fire marshal would want to have a word with them if it was locked to get out. So it's just not the case here. Two questions. Is the fact that he was arrested at the end, isn't that a factor we should consider as well as to whether or not he was in custody? It is a factor. It's one that cuts at most very weakly in his direction. Just keep in mind, he wasn't arrested at the end. He was arrested after a break where there's that intervening event where they talk to the AUSA. They compare notes about what happened. They compare notes about what happened at the search, and then they decide to arrest him. To the extent the cases are concerned about that, they're concerned about a form over substance circumstance where every fact points in favor of custody except them announcing you're under arrest, and at the end they say, oh, and by the way, you're under arrest. I mean, that's different than what we have here. Wasn't he allowed to use the restroom, et cetera, after the interview before he was arrested? Yes, Your Honor. He was allowed to use the bathroom and make a couple of calls, I believe. So there was a break. Now, it's not as big of a break as in some of the cases. We'll concede that. But there is an intervening event, and it just doesn't cut that strongly. My other question, and I think I know the answer already, but I just want to confirm this. The fact that he is a police officer doesn't play into this analysis at all? Not quite, Your Honor. Subjective facts usually don't matter except for age under JDB v. North Carolina. But under Howes, I think the fact that he's a police officer weighs in our favor in two respects. One, it means he's more familiar with the location, like the prisoner in Howes, and two, he'd be more familiar with what they mean when they say he's not under arrest. So the district court judge thought that if he wasn't going to be interviewed at his home, which would be a less coercive environment, he should have been interviewed at his own precinct. The agents seem to have at least told Mr. Martinez that the reason they weren't doing that was because it would be embarrassing for him to be interviewed at his own precinct about these particular charges. And Mr. Martinez expresses gratitude that this wasn't being done in front of the officers in his squad. So does that play into our analysis at all? I see my red light as I may answer the question. Yes, you may. The answer is it doesn't really play into your analysis. What matters is where he was interviewed, not where he wasn't. Where he was interviewed was still at DPD headquarters. He's a Detroit police officer. He's going to be more comfortable there than a layperson is. But there were two reasons why he wasn't interviewed at his precinct. I think both are reflected by the record. One is not to embarrass him when you're telling somebody, hey, we found your collection of child pornography. Try and do it discreetly. This is the type of thing that even an allegation can ruin somebody's life. So law enforcement is pretty sensitive to the fact that just throwing that out there in front of his fellow officers could be a problem, especially if it turned out somebody else was using that computer and not him. And also they wanted to make sure he wasn't armed. And that was the whole point of the ruse was to make sure that when you tell someone, hey, by the way, we're the FBI and we know you have child pornography, they don't have a gun on them. Because this is also the type of allegation that causes people to do pretty dangerous things, causes them to panic. I mean, it's a common reason for prison suicide. So those are the two reasons of why. So I'm sorry, but as a legal matter, you're saying the district court erred because he focused on whether there were sort of less restrictive alternatives to where the interview took place. Your answer is we only look at where the interview took place, not at other places that it might have taken place. Correct. Got it. Okay. Thank you, Mr. Goetz. Thank you. Good morning, and may it please the Court. I'm Josh Blanchard. I'm here on behalf of the appellee, Mr. Martinez. When the FBI agents tricked Mr. Martinez, a Detroit police officer, into showing up for an interrogation by lying to him and telling him there was an injured officer, then taking him deep into a police station that he was not familiar with, that was controlled by the Michigan State Police, that required key cards to access both the elevators and the doors, then they separated him from his weapon, separated him from his partner, had him turn off his communication devices, and then when he tried to sit next to the door, told him to go to the other end of the table. When all of those things happened, Mr. Martinez was in custody or its equivalent. To be clear, when you listen to the audio, there's 80 minutes of this back and forth that, to me, sounds like Mr. Martinez trying to get out of that room without getting arrested, and the police or the FBI agents trying not to let him get out of that room. And on Judge Larson's question about what deference do we owe to the finding of desperation, I think it's clear error. And the reason is Judge Tarnow had an opportunity to hear testimony both from the agent who was doing the interrogation and Mr. Martinez at the evidentiary hearing. That's something that your honors don't have the opportunity to do and to compare and contrast. And so that's something that the trial court was uniquely situated to compare their demeanor and their testimony at that time. And there was some discussion about some subjective factors that I think would inform the court's decision on whether there was desperation. And so I think the court owes deference to the trial court's decision there. Do most of those instances that you cite where he asked to leave, I mean, I listened to it as well. It sounded like they mostly were, I just wish I could go out and arrest this guy that I suspect had a gun or some previous thing that he was working on he wanted to finish. Or he said, I want to be with my teammates or whatever. That was the expression. Or I want to go home. And the negative types, the negative or quasi-negative responses to those sounded like that's something you won't be able to do. I mean, in light of this investigation, you're not going to get to go out and make the arrest that you wanted to make today. Or you're not going to get to go into your home anyway because they're not going to let you in your home while they're doing this. So those are sympathetic in a way, but they don't sound like you're stuck here. So maybe any one of them in isolation, I would agree. It's just that there's a whole lot of you can't go here and you can't go there suggests that you have to stay here. And then at 49 minutes and 15 seconds in, and so we're quite a ways in, Mr. Martinez says, yeah, I can't sit here. If I can just terminate this and just go home, I'm fine. Do you want to call and make sure your agents are gone and all that? It's just, man, they tore up my house. I know they did. And rather than say, you can take off, the special agent says, hey, say, Miguel, they don't. They're not going to tear the house up. And they redirect when he says, I want to terminate this right here and go home. Yes, I just quibble with the numbers. There are a couple of places like that where it sounds like I just need to get out of here. But most of them sound like I need to go do something in particular, like be with my buddy, whatever he refers to as his teammates. If you say 10, it's more like one or two, I guess is what I'm saying. Well, and if it had just been those light versions, I don't know that I would count. I think it would be a different case. I would be in a different position. But, I mean, there were some very clear requests. And at one point, early on, I think about 11 minutes in, he's talking about wanting to work. And he says, your shift's not going to happen. I don't know what authority the FBI had to tell him his shift wasn't going to happen. And then another time when he says he wants to work. That estimation, which is probably correct, could have been perfectly true without saying you can't go to the grocery store and get some groceries while you're waiting for them to finish. I think it was a clear expression that he wanted to be done and he wanted to go try. And I don't think the FBI can stop him from that. Now, maybe your Honor's right that he wouldn't have been allowed to work a shift. Maybe the court's wrong about that if he hadn't been arrested. I don't know. But the reality is he wasn't given an opportunity to leave because every time he made those expressions, the agents redirected and tried to question him. At one point, they say, well, you just listen to what we have to say. Why does he need to just listen to what they have to say if he's free to go? They should have said thank you, have a nice day. And kind of on that same tone, I don't think that saying, you know, they thank him for being there voluntarily. The first time they do that, they haven't even told him why he's there, right? He came there thinking he was helping out an injured officer. They say thanks for being here voluntarily. And then each of these other times they reference voluntary, they're referencing that first statement. Well, just saying something doesn't make it true. And he knows he's not there voluntarily. He was tricked into that room. And if we're looking at the factors from Salvo on – But it does convey some of we consider this to be that you're here voluntarily. I mean, it does. Yeah, aren't they communicating to him their impression that he's there voluntarily, which would communicate to him that he is free to leave? Except that they don't allow him to leave when he expresses he wants to. And they're holding his property. The district court found that he placed his gun in that lockbox. And the testimony was that they retained the key to the lockbox. And so they're holding his property at this point. And so it's not just quite as easy as get up and leave. You've got a police officer who doesn't have his duty weapon. And so it's not just so easy as walk out the door. Then we have the issue, the government's – Well, he could have walked out the door and then gone to get his gun back later. He doesn't need the gun in order to be free. He might need the gun in order to work his shift. But he doesn't need – I mean, he's at liberty with or without his gun. I think it's somewhat like if they took his car keys and he wanted to leave. I don't think we would say that that factor doesn't bear on his freedom to leave or whether he's been restricted when they take his property and hold it from him. It tends to hold him in that room. I agree he could have – I don't know the analogy. I mean, you don't need a gun for transportation. So the car key seems like a strange analogy to me. Also, I mean, isn't it standard police practice to disarm people even if they're there for a voluntary interview? I would think so. Except that he was brought there not for an interview. Many of the cases they say, well, the suspect came voluntarily, I think, or they invited the officer in, like in Salvo and Payneck. Here he's tricked into this room, and they don't tell him they want to interview him about something. They tell him to put his gun in the locker, and then he's suddenly in the room and they start confronting him. Is it standard police practice? I would imagine so. But does that – I think that bears on if they're ordering him, they're exerting control over him, telling him to disarm. I think that bears on his freedom to move, right, and whether there was restraint on him. I think holding someone's property, saying – making the person take the choice of either I'm going to abandon my property or I'm going to stay here. They're saying it is standard police practice even in a voluntary interview to disarm someone. So I don't know how the fact that he is disarmed can show me the line between whether it was voluntary or not voluntary. I don't think it's standard police practice to interview on-duty police officers, though. And so that's – But what if I had a concealed weapons permit, and I have my concealed weapon, and the officer says I'd like to interview you about this, and I say, well, officer, I need you to know that I have a concealed carry permit. Here's my weapon. Here's my permit. I assume the officer would now take the weapon from me. I don't think the officer would like – I mean, I don't know. You can tell me, but it seems unusual that the officer would allow me to sit there with a loaded gun while he's interviewing me, even if it's abundantly clear that it's just a voluntary interview. I think the facts would probably inform it, but my guess would be the officer would ask permission to secure it rather than order that it be secured if it's a voluntary interview. And the testimony here was not that they asked him if he wanted to give up his gun. It's that he was directed to, and Judge Tarnow asked the question of the agent, well, if he hadn't put it in there, would you have made him? Yes. And so it was a direction to do it rather than a voluntary request. And so I think that shows they're exerting some dominion and some control over him when they're going into that room. On the location of the interview, I think it's significant. I mean, it's in the record. The FBI agents are armed. They're between him and the door. That's a factor that's been considered before. My client was not familiar with this location. The government says, well, it was the DPD headquarters. The testimony was he had been to that building twice before, and he had never been in the Michigan State Police portion. It wasn't under the control of DPD. And so I don't think that it happened to be owned by his employer is very instructive. It would be a different scenario if, like Judge Rogers wrote in Elliott, we were interviewing someone in a room at their place of employment that they were familiar with. That would be a different scenario. If they'd gone out to the 10th Precinct and talked to him in a squad room or a conference room that he was familiar with, he'd feel more comfortable. Just like if they'd gone to his home, we would say, well, he'd feel more comfortable. Instead, they put him somewhere in the middle of a building in Detroit that he's not familiar with where he can't access the outside. He doesn't know where he's at, and they start questioning him. Is your position that the government has to choose the most comfortable place? So among the range of alternatives, we have three on the table. His home might be the most comfortable, but it was being searched, so they can't really do it there. The police station might be the most comfortable, I guess, in that he's the most familiar, although also might have caused him a great deal of anxiety if he's being interviewed by the FBI in front of his coworkers. But let's say, I mean, he's certainly more familiar with the precinct. Do they have to choose the most comfortable among the range of available alternatives? No, I don't think the law requires that they choose the most comfortable. I do think the law requires that they live with the consequences of their decisions, and if they choose a custodial environment and they don't Mirandize them, they have to live with that. And I know officers, I know from experience, agents will go out and do knock-and-talks at home because they want it to be low-key and they want to get a confession at home, and they do that strategically. They made a strategic decision here to trick him into coming to the police department, to take him into an area he was unfamiliar with, to disarm him, to put him in a room and not let him sit next to the door, to not allow him to leave when he said, can I get some water. They sent someone... He didn't ask, may I leave to get some water. He said, may I have some water, I think. I can re-listen to the recording, but that's my recollection, that he said, can I have some water. My recollection was, can I get some water, but I think that could be interpreted either way. Either way, fair enough. But he wasn't permitted, and Judge Tarnow made a finding that when he asked the question, the agent shook his head no, and then another agent went to get it. And so I think... What was that based on, do you think? Was there testimony? Yes, there was testimony from Mr. Martinez at the hearing that the court credited, at the suppression hearing, that that happened. That he shook his head no. Correct. And I think that is instructive on whether his ability to move had been limited. I mean, it would be a more difficult case for me if they had walked him down to the water fountain and accompanied him. But they didn't... Once he went into that room, he did not leave until he was arrested. Now they say, we let him go to the bathroom, we let him make some phone calls. That's true. He was accompanied the whole time. And I think he was informed that he was under arrest before he did those things, but he was allowed to do those things before he was taken to jail. How would you respond to the question I'd asked Mr. Goetz about your client's status as a police officer? Should that bear into our analysis any? I don't think so. I think it's an objective standard. I think Yarborough is the case that says it's objective we don't get into his head. But I also think the record is such that it wouldn't matter. The record evidence is that he didn't Mirandize people, he didn't interview people. For 30 years, he was a patrol officer responding to calls. And I think it's in the record that the DPD processes, they have investigators do the interviews in the Miranda. So you don't think it's relevant to his understanding of whenever he was told he was not under arrest, the fact that he's a police officer? No, I don't think so. Because he's not... There's no record evidence that he's doing this kind of work. And also, you've got to... I think we have to view the whole interview in context. And he's also asking, am I going to be arrested? And they won't answer that question. And you can contrast that with the cases where at the outset, I think Oregon versus Matheson, they tell him, you know, you're not going to be arrested today. And they let him leave. But... And then... Isn't it possible that whether he was going to be arrested depended on two things, what they found during the search and what he said during the interview? So I don't know how they could have truthfully said, no, you won't be arrested today. It happens frequently. It happens in reported cases that they say, whatever happens today, you're not going to jail. And that... But they can always... I mean, maybe they can lie. But they couldn't have truthfully said that because they wouldn't have known. If they had searched his home and come up with nothing on his computer, presumably he would not have been arrested that day. Or if he had made no incriminating statements, then he would not have been... Right? Like, it depended on what they found. So how can they say ex ante, no, you won't be arrested? I mean, there are reported cases where people confess to murder. They walk out the door later, they're charged, right? I mean, that happens. And I don't think there's any record evidence here that they found anything on the computer prior to the arrest decision. And so I don't think it was the search of the computer that informed it. Very frequently in these cases we see that they do the search and then weeks or months later they indict. And so I see my red light is on. Thank you, Mr. Blanchard. Thank you. So that last point isn't true. There is record evidence that what they found during the search was very concerning. If you look at the bond transcript on February 27, 2017, it turns out they found his laptop on his bed next to a child's pillow. That's where they found his laptop. So that is in the record, and the district court knew that. Second point, his comment about wanting to go home, he takes that right out of context. It occurred immediately after the officers said, and this is a quote, you're here voluntarily, we've never said you can't leave. And then they go back and forth on whether his chief has been told, and he says, so I can leave now and go home. The agent then responds, well, there might be someone else who wants to talk to you. So that's not a statement, you're here and you can't leave. That's a statement that even if you leave here, somebody else will want to talk to you before you can get home. So that is just a different point than what defense counsel has said here. And that really gets back to the ultimate question here, whether this was the equivalent of a formal arrest. The defense counsel, both in their briefs and here, want to talk about, well, it's just whether his freedom of movement was curtailed. That's not the question. Berkimer says that's not the question. Swanson says that's not the question. The question is whether this rises to the degree of restraint on freedom of movement like a formal arrest. That's a much higher bar. Getting to the freedom of movement point, he wasn't handcuffed. That much is undisputed in the record. There were no guns drawn. Yes, they were armed, but they were dressed like me. They were dressed in a suit, and the guns were covered up by the suit. They weren't brandishing the guns. The defendant conceded in his testimony, that's at page 284, there were no threatening gestures. And, yes, the conference room door was closed, but the defendant actually conceded in his testimony again, that's the middle of page 283, that the agents didn't bar the door, didn't block the door, didn't block him from leaving. So the freedom of movement prong supports us, too. Now, I'm happy to answer. What about the water? The water gets to the same point that I think the court made in Elliott and that the court has made in other circumstances, that just because he might have needed somebody to come with him or wasn't allowed to go to walk around unaccompanied within a restricted area doesn't mean he wasn't free to leave the interview.  And the agent then got him the water. And this, I think, also gets to Judge Larson's point. It wasn't an unequivocal request to leave the room and go get water. He just asked for some water and the agent immediately got it for him. There was testimony as to that, though, right? The judge isn't just relying on the recording. The only testimony was the agent shook his head no. It's not clear what that meant. Now, the judge did make a finding that that meant the agent wasn't going to let him leave and go get water. That's just a different question than whether he's free to terminate the interview and leave. But on that issue, it would be clearly erroneous rather than de novo. Yes, that's correct. I mean, that's a fact finding, and it cuts weakly against us, but it's not outweighed by all the other factors. With that, we'd ask that the district court's order be reversed. Thank you. Thank you to both counsel. Will the clerk call the next case, please?